**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHASE BANK USA, N.A.,** | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | **Civil Action No.** |
| **v.** | **)** | |
| **EVELYN L. HILLIS,** | **)** | |
| **Defendant.** | **)** | |

**COMPLAINT/MOTION OF PLAINTIFF CHASE BANK USA, N.A.,**
**FOR CONFIRMATION OF ARBITRATION AWARD**

Pursuant to Rules 54 and 58 of the Federal Rules of Civil Procedure and of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9 and 13, plaintiff Chase Bank USA, N.A. ("Chase"), moves the Court to enter a final judgment by confirming an arbitration award. The award was entered pursuant to the rules of the American Arbitration Association ("AAA").

As grounds for its motion, Chase states as follows:

1. In or about August 2003, Evelyn Hillis ("Hillis") opened a credit card account with Chase (the "Account"). The Account was governed at all times by a cardmember agreement ("CMA"), a facsimile copy of which is attached hereto as Exhibit A.

2. Pursuant to the CMA, disputes between Chase and Hillis are to be resolved through binding arbitration. On or about March 12, 2006, Hillis filed an Arbitration Claim with the AAA.

3.   Hillis' Demand for Arbitration alleged violations of the Fair Credit Billing Act ("FCBA"), 15 U.S.C. §§ 1666-1666j, and the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f.

4.   Hillis' claims are based on a series of form letters sent to Chase beginning in July 2005. Hillis' form letters were identical in all material respects, differing only in dates and numerical amounts. These letters alleged that Chase had committed numerous violations of the FCBA. The form letters stated in pertinent part:

> My belief that the statements contain billing errors under 15 U.S.C. 1666(b)(1), (2) and (5) is based upon my belief that you failed to give all the proper disclosures required by law to me prior to opening this account, and additional disclosures since then. Because you failed to provide these disclosures, the account could not legally be opened and I should not be responsible for the payment of interest, fees or other finance charges. While I understand I will likely still be responsible fore the repayment of purchases and cash advances, I do not believe I should be responsible for interest, finance charges and other fees . . . .

(A true and correct copy of Hillis' July 25, 2005 letter to Chase is attached hereto as Exhibit B.)

5.   On February 13, 2007, Arbitrator David J. Armstrong issued an Award that dismissed, with prejudice, all of Hillis' claims asserted in her Arbitration Claim. (A true and correct copy of the Award is attached hereto as Exhibit C.)

6.   Pursuant to §§ 9 and 13 of the FAA, Chase requests that the Court adopt and confirm the Award attached hereto and enter final judgment in accordance with said Stipulated Award.

Respectfully Submitted,

Date: 2-26-07

By: ______________________
Jonathan T. Krassenstein
Pa. ID #52095
Toni L. DiGiacobbe
Pa. ID #56686

Krassenstein & Associates
Professional Corporation
7500 Brooktree Drive
Wexford, PA 15090
(724) 935-6227

Attorney for Chase Bank USA, N.A.

# Cardmember Agreement

This is the Agreement that establishes the terms of your Cardmember Account ("Account") with First USA (including accounts opened with us through other banks that participate in our MasterCard/Visa program and whose name may be on the face of your Card). Please read it carefully and keep it for your records. You do not need to sign this Agreement, but please be sure to sign the back of your Card if you have not already done so. All extensions of credit in connection with your Account are being made by First USA in Wilmington, Delaware. Any use of your Card or Account confirms your acceptance of the terms and conditions of this Agreement.

**Definitions:** In this Agreement the words "you" and "your" refer to each person (jointly and severally if more than one) who has applied for the Account and any other person who has agreed to be responsible for the Account. The words "we", "us" and "our" refer to First USA. "Card" refers to each MasterCard and/or Visa Card that is issued on your Account. The Card must be returned or surrendered to us or our agent upon request.

**Using Your Account:** You may use your Card or Account to purchase or lease goods or services or pay amounts you owe wherever the Card is honored or transfer balances from other accounts ("Balance Transfers") (collectively, "Purchases"). You may also use the Card to obtain cash loans ("Cash Advances") from any financial institution that accepts the Card. You agree to accept credits to your Account instead of cash refunds when the original Purchase was charged to your Account. We may issue "Convenience Checks" to you which may be used to access your credit line. Use of a Convenience Check will be treated as a "Purchase" in the amount of your check. Each Convenience Check will contain your Account number and may be used only by the person(s) whose name(s) is/are printed on it. Each must be completed and signed by you (or either of you) in the same manner as a regular personal check.

You may not use Balance Transfers or Convenience Checks to pay any amount you owe us under this Account or any other credit agreement or account you may have with us or any of our related banks.

**Obligations On Your Account:** You authorize us to pay and charge your Account for all Purchases and Cash Advances made or obtained by you or anyone you authorize to use your Card or Account. You promise to pay us for all of these Purchases and Cash Advances, plus any Finance Charges assessed on your Account and any other charges and fees which you may owe us under the terms of this Agreement. You will be obligated to pay authorized charges to your Account whether resulting from (1) actual use of your Card or Convenience Checks, (2) mail order or telephone, computer or other electronic Purchases made without presenting the Card or (3) any other circumstance where you authorize a charge, or authorize someone else to make a charge, to your Account. Each person who is included within the definition of the term "you", above, is responsible to pay the full amount owed on the Account. We may require that you pay the full amount owed without first asking the other person(s) to pay. All payments must be made in U.S. dollars. Any payment made by check or other negotiable instrument must be drawn on a U.S. bank or a U.S. branch of a foreign bank. Subject to any mandatory provisions of applicable law, we will apply your payments to the balances in your Account in whatever manner we determine.

**Credit Line/Authorized Usage:** Your credit line is shown on the folder containing your Card. Since we may change your credit line from time to time, your latest credit line will appear on your monthly statement. You agree not to make a Purchase or obtain a Cash Advance that would cause the unpaid balance of your Account to exceed your credit line. We may honor Purchases and Cash Advances in excess of your credit line at our sole discretion. If we do, this Agreement also applies to that excess and you agree to pay the excess immediately if we request that you do so. You agree that we may change or cancel your credit line at any time without affecting your obligation to pay amounts that you owe under this Agreement. We may designate that only a portion of your credit line is available for Cash Advances. If we do and you exceed that limit, you will be considered to have exceeded your credit line for all purposes of this Cardmember Agreement. For security reasons, we may limit the number or dollar amount of Purchase, Cash Advance and/or Convenience Check transactions that may be accomplished with your Card or Account, and we have the right to limit authorizations to make Purchases or obtain Cash Advances if we consider it necessary to verify payments received on your Account.

**Periodic Statements:** We will send a statement at the end of each monthly billing cycle in which your Account has a debit or credit balance of more than $1.00 or a Finance Charge has been imposed. Among other things, your monthly statement will show your New Balance, any Finance Charge, your credit line and available credit, your Minimum Monthly Payment and the Payment Due Date.

**Default/Collection Costs:** Unless otherwise prohibited by applicable law, your account will be in default and we may demand immediate payment of the entire amount you owe us without giving you prior notice if: (1) in any month we do not receive your Minimum Monthly Payment by the Payment Due Date; (2) you make Purchases or obtain Cash Advances in excess of your credit line; (3) you fail to comply with this Agreement; (4) there is a filing for your bankruptcy; (5) you die or become incapacitated; or (6) we believe in good faith that the payment or performance of your obligations under this Agreement is impaired for any other reason. As permitted by applicable law, you agree to pay all collection expenses actually incurred by us in the collection of amounts you owe under this Agreement (including court costs and the fees of any collection agency to which we refer your Account) and, in the event we refer your Account after your default to an attorney who is not our regularly salaried employee, you agree to pay the reasonable fees of such attorney. We will not be obligated to honor any attempted use of your Account if a default has occurred or we have determined to terminate your Account or limit your Account privileges (as discussed below).

**Arbitration:** Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure in effect at the time the Claim is filed. Rules and forms of the National Arbitration Forum may be obtained and Claims may be filed at any National Arbitration Forum office, www.arb-forum.com, or P.O. Box 50191, Minneapolis, Minnesota 55405, telephone 1-800-474-2371. Any arbitration hearing at which you appear will take place at a location within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16. Judgment upon any arbitration award may be entered in any court having jurisdiction.

This arbitration agreement applies to all Claims now in existence or that may arise in the future except for Claims by or against any unaffiliated third party to whom ownership of your Account may be assigned after default (unless that party elects to arbitrate). Nothing in this Agreement shall be construed to prevent any party's use of (or advancement of any Claims, defenses, or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security or property interests for contractual debts now or hereafter owed by either party to the other under this Agreement.

**IN THE ABSENCE OF THIS ARBITRATION AGREEMENT YOU AND WE MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT BEFORE A JUDGE OR A JURY, AND/OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS (INCLUDING CLASS ACTIONS), BUT EXCEPT AS OTHERWISE PROVIDED ABOVE, THOSE RIGHTS, INCLUDING ANY RIGHT TO A JURY TRIAL, ARE WAIVED AND ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.**

**Termination:** We may terminate your privileges under this Agreement or limit your right to make Purchases or obtain Cash Advances at any time (and list your Account in warning bulletins) without notice or liability. If we do, you must return your Cards and any unused Convenience Checks to us, cut in half. You agree that you will not try to make a Purchase or obtain a Cash Advance after you have been notified that your privilege to use your Account has been terminated. You may terminate this Agreement at any time. If you do, you must return to us all Cards and Convenience Checks previously issued on the Account. If you call us, we may require that you confirm your intent to terminate in writing. Your or our termination will not affect your existing obligations under this Agreement or your liability for all charges posted to your Account prior to the time all Cards and unused Convenience Checks issued on your Account are returned to us.

**Notices:** We will send statements and any other notices to you at the address shown in our files. If this is a joint account, we can send statements and notices to either of you. You promise to inform us promptly in writing of any change in your address. At our discretion, we may accept address corrections from the United States Postal Service.

**Skip/Promotional Features:** From time to time, we may let you skip or reduce one or more monthly payments during a year and/or we may temporarily reduce or eliminate certain Finance Charges on all or a portion of your Account balance or offer you other special terms. If we do, we will advise you of the scope and duration of the applicable skip or promotional feature. When the skip or promotional feature ends, your regular rates and terms will resume.

**Changes In This Agreement:** We can at any time change this Agreement, including the **ANNUAL PERCENTAGE RATE** and any fees, and can delete provisions relating to your Account and to the nature, extent, and enforcement of the rights and obligations you or we may have relating to this Agreement. We will notify you of any change, addition, or deletion. As permitted by applicable law, any change, addition, or deletion to this Agreement will become effective at the time stated in our notice and, unless we state otherwise, the change, addition, or deletion will apply to all outstanding balances in your Account as well as to new transactions. The notice we send you may state that you may notify us in writing within a specified time period that you do not wish to accept certain of the changes, additions, and deletions we are making. You will be deemed to accept all the changes, additions, and deletions accompanying the notice and to ratify and confirm all the provisions of your Agreement and your acceptance of all the changes, additions, and deletions described in other notices previously sent to you if (1) you do not send us such a notification in a timely manner, or (2) you use the Card or Account after the conclusion of the specified time period.

**Credit Information:** You agree that we may request consumer credit reports from one or more credit reporting agencies in connection with your application and the administration of your Account. You also authorize us to exchange credit information concerning you or your Account with (and answer questions and requests from) others, such as merchants, other lenders and credit reporting agencies. We may share information about you with our affiliated companies.

**Phone Calls:** In the regular course of our business we may monitor and record phone conversations made or received by our employees. You agree that we will have such right with respect to all phone conversations between you and our employees, whether initiated by you or any of our employees.

**Refusal To Honor Card:** We are not responsible for refusals to honor your Card or Convenience Checks. And, except as otherwise required by applicable law or regulation, we will not be responsible for merchandise or services purchased or leased through use of your Account.

**Irregular Payments And Delay In Enforcement:** We can accept late payments, partial payments, checks and money orders marked "Paid in Full" or language having the same effect without losing any of our rights under this Agreement. We can also delay enforcing our rights under this Agreement any number of times without losing them. The fact that we may at any time honor a Purchase or Cash Advance in excess of your maximum credit line does not obligate us to do so again.

**Assignment:** We may at any time assign your Account, any sums due on your Account, this Agreement or our rights or obligations under this Agreement. The person(s) to whom we make any such assignment shall be entitled to all of our rights under this Agreement, to the extent assigned.

**GOVERNING LAW: THIS AGREEMENT AND YOUR ACCOUNT WILL BE GOVERNED BY THE LAW OF THE STATE OF DELAWARE AND, AS APPLICABLE, FEDERAL LAW**

## YOUR BILLING RIGHTS

**Keep This Notice For Future Use**

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case Of Errors Or Questions About Your Bill**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at Cardmember Service, P.O. Box 8776, Wilmington, Delaware 19899-8776. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

**Your Rights And Our Responsibilities After We Receive Your Written Notice**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

(b) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

R1

EXHIBIT A

Table of Interest Charges

The Daily Periodic Rate we use to determine your Periodic FINANCE CHARGE for Purchase balances for the first 5 billing cycles following the opening of your Account (the "Introductory Period"), is a fixed rate of 0%, corresponding to an ANNUAL PERCENTAGE RATE of 0%.

After the Introductory Period ends, the Daily Periodic Rates we use to determine your Periodic FINANCE CHARGE for both Purchase balances and Cash Advance balances are variable rates. They are called "Standard Rates". They vary according to movement in the prime rate, and as such can increase or decrease from month to month. The rates will be calculated each month on the first business day of the month. On that day, we will see what the U.S. prime rate published in *The Wall Street Journal* was on the immediately preceding Determination Date. The "Determination Date" is the 22nd day of the month (or the next business day after that if it falls on a weekend or holiday). We will add to that prime rate 6.99% for your Purchase balances and 15.24% for your Cash Advance balances and multiply the sum by 1/365 to give us your respective Daily Periodic Rates. If more than one prime rate appears in *The Wall Street Journal* on the Determination Date, we will pick the highest. If *The Wall Street Journal* stops publishing prime rates, we will select a comparable index and tell you the following month. If our calculation results in new Daily Periodic Rates, they will take effect on Purchase balances and Cash Advance balances as of the first day of your billing cycle that ends in the month in which we do the calculation. If the Daily Periodic Rates increase, you will have to pay a higher Periodic FINANCE CHARGE and may have to pay a higher minimum payment. The Annual Percentage Rate for each balance shall be its Daily Periodic Rate times 365. It will never be less than 11.24% for Purchase balances and 19.49% for Cash Advance balances. The corresponding Daily Periodic Rates will not be less than 0.03080% for Purchase balances and 0.05340% for Cash Advance balances.

On April 11, 2003 the prime rate was 4.25%. Using that prime rate as an example, your Daily Periodic Rate for Purchase balances would equal 0.03080% and the Annual Percentage Rate would equal 11.24%. And your Daily Periodic Rate for Cash Advance balances would equal 0.05340% and the Annual Percentage Rate would equal 19.49%.

FOR ADJUSTED RATE FOR LATE PAYER: SEE "FINANCE CHARGES FOR LATE PAYMENT"

| | |
|---|---|
| **Cash Advance FINANCE CHARGE** | |
| ATM Cash Advance | 2% of Cash Advance (with a minimum of $10.00) |
| All Other Cash Advances | 2% of Cash Advance (with a minimum of $10.00) |
| **Transaction FINANCE CHARGE** | 3% of applicable transaction (with a minimum of $5.00 and a maximum of $50.00) |
| **Balance Transfer FINANCE CHARGE** | 3% of applicable transaction (with a minimum of $5.00 and a maximum of $50.00) |
| **Minimum FINANCE CHARGE** (If any Finance Charge is payable for a monthly billing cycle) | $1.00 |
| **Annual Membership Fee** | None |
| **Other Interest Charges:** | |
| Late Fee | $29.00 |
| Return Payment Fee | $29.00 |
| Return Convenience Check Fee | $29.00 |
| Overlimit Fee | $29.00 |
| **Administrative Fees:** | |
| Duplicate of Merchant Sale Slip | $5.00 |
| Duplicate Copy of Monthly Billing Statement | $5.00 |

**Finance Charges for Late Payment:** If you do not pay at least the Minimum Monthly Payment by the Payment Due Date one time during the Introductory Period, the Introductory Period will end and the Standard Rate for Purchases described in the Table of Interest Charges will take effect as of the first day of the billing cycle following your late payment.

If you do not pay at least the Minimum Monthly Payment by the Payment Due Date two times during any 6 month period, the Daily Periodic Rate for all balances may change to an adjusted rate of 0.05478%, corresponding to an ANNUAL PERCENTAGE RATE of 19.99% (the "Adjusted Rate"). The Adjusted Rate will take effect as of the first day of the billing cycle following your second late payment. If your current rate is greater than the Adjusted Rate, your ANNUAL PERCENTAGE RATE will not change.

During any period when a promotional APR ("Promotional Period") is in effect, if you do not pay at least the Minimum Monthly Payment by the Payment Due Date one time during such period, the Promotional Period and promotional APR will end and the applicable APR as described in the Table of Interest Charges will take effect.

**Minimum Monthly Payment:** If the New Balance shown on your monthly statement is less than $10.00, your Minimum Monthly Payment (due by the Payment Due Date) is your New Balance. Otherwise, the Minimum Monthly Payment for each billing cycle will be the greater of $10.00 or the total of (1) 2% of the New Balance, plus (2) any amount past due, plus (3) if we so elect, any amount over your credit line at the time of billing. You may pay more than the Minimum Monthly Payment and may at any time pay the full amount you owe us. In the event that an APR on your Account exceeds 24%, your Minimum Monthly Payment may increase and remain at the greater of 2.5% or $15.

**Minimum Finance Charge:** There is a minimum FINANCE CHARGE in the amount stated in the Table of Interest Charges in any billing cycle in which you owe a Periodic FINANCE CHARGE.

**Periodic Finance Charge Calculation—Two-Cycle Average Daily Balance Method (Including New Purchases) for Purchases and Average Daily Balance Method (Including New Transactions) for Other Transactions:** We calculate Periodic FINANCE CHARGES separately for each feature such as Purchases, Cash Advances, Balance Transfers, Convenience Checks or Promotional Balances. We figure the Periodic FINANCE CHARGES by applying the applicable Daily Periodic Rate shown in the Table of Interest Charges to each feature's daily balance for each day of the current billing cycle. In addition, for Purchases, we apply the Daily Periodic Rate to the daily balance for each day of the previous billing cycle adjusted as described below.

To get the daily balance for each day of the current billing cycle, we take the beginning balance for each feature, add any new transactions or other debits (including fees and other charges), subtract any payments or credits, and make other adjustments. Transactions are added as of the later of the transaction date or the beginning of the billing cycle in which they are posted to your Account (except that Convenience Checks are added as of the date accepted by the payee). Fees are added either on the date of a related transaction or the last day of the billing cycle. This gives us that day's daily balance. A credit balance is treated as a balance of zero. We multiply the daily balance by the applicable Daily Periodic Rate, as stated in the Table of Interest Charges, to get your Periodic FINANCE CHARGES for that day. We then add these Periodic FINANCE CHARGES to your daily balance to get the beginning balance for the next day. For Purchases, we do the same thing for each day of the previous cycle to get the daily balance of Purchases for the previous billing cycle. However, the daily balance for previous billing cycle Purchases is considered to be zero for each day of the previous billing cycle if a Periodic FINANCE CHARGE was already imposed on Purchases itemized on your previous statement or you paid your New Balance on your previous statement in full by the payment due date.

To get your total Periodic FINANCE CHARGE for a billing cycle, we add all of the daily Periodic FINANCE CHARGES for all features. If you multiply the Average Daily Balance for each feature by the applicable Daily Periodic Rate and the number of days in the applicable billing cycle(s) and add the results together, the total will equal the Periodic FINANCE CHARGES for the billing cycle, except for minor variations due to rounding. To determine an Average Daily Balance, we add your daily balances and divide by the number of the days in the applicable billing cycle(s).

If we have "special" periodic rate offers in effect from time to time, we will separately identify them on the front of your statement and separately disclose the balances to which the special rates or terms apply. These separate balances and the related Finance Charges will be calculated in the same manner as described above.

**Grace Period:** Periodic FINANCE CHARGES are added to your balance from the later of the transaction date or the beginning of the billing cycle in which they are posted to your Account (except that they are charged on Convenience Checks from the day the check is accepted by the payee). They continue to be added until the day we receive payment in full. However, we do not charge Periodic FINANCE CHARGES on new Purchases (other than Balance Transfers and Convenience Checks) if you pay your full New Balance by the Payment Due Date and your Previous Balance was zero or a credit balance. There is no grace period for Cash Advances, Convenience Checks, and Balance Transfers.

We figure another portion of the Finance Charge on your Account by adding a one-time Cash Advance FINANCE CHARGE for each Cash Advance when it is obtained. The amount of the Cash Advance FINANCE CHARGE is stated in the Table of Interest Charges.

If you use your Card or Account to do a Balance Transfer; purchase money orders or wire transfers; purchase travelers checks or foreign currency other than at a bank, or if you use a Convenience Check, we will charge a one-time Transaction FINANCE CHARGE for each such Balance Transfer, Purchase or check usage in the amount stated in the Table of Interest Charges.

The total Finance Charge on your Account for a monthly billing cycle will be the sum of the Periodic FINANCE CHARGES plus any Cash Advance FINANCE CHARGES and any Transaction FINANCE CHARGES.

This Agreement provides for daily compounding of Finance Charges (interest).

The Periodic FINANCE CHARGES are subject to change as described in the Payment Sections hereof entitled respectively, Changes in this Agreement and, where included, Finance Charges for Late Payers and NonPayment.

**Other Interest Charges:** In addition to the Finance Charges discussed above, the following interest charges will be applicable to your Account:

**Annual Membership Fee**—You agree to pay us when billed each year (subject to applicable federal law) a non-refundable annual membership fee in the amount stated in the Table of Interest Charges for the privileges you have under this Agreement, whether or not you exercise those privileges. Your payment of this fee will not affect any of our rights under this Agreement, including our right to terminate your Account.

**Late Fee** - If we do not receive a payment from you in at least the amount of your Minimum Monthly Payment by the Payment Due Date shown on your monthly statement, we may charge you a late payment fee in the amount stated in the Table of Interest Charges. You will only be charged one late payment fee for any Minimum Monthly Payment which is not paid by the Payment Due Date.

**Return Payment Fee** – If your bank does not honor the check or direct debit you remitted to us to pay amounts you owe under this Agreement, or we must return a check because it is not signed or is otherwise irregular, we may charge you a return payment fee in the amount stated in the Table of Interest Charges.

**Return Convenience Check Fee** - If we (a) stop payment on a Convenience Check at your request or (b) return a Convenience Check unpaid because it exceeds your available credit at the time it is presented, your Account is closed or otherwise does not have charge privileges, or your Account is past due, we may charge you a return Convenience Check fee in the amount stated in the Table of Interest Charges.

**Overlimit Fee**—We have the right to charge an overlimit fee in the amount stated in the Table of Interest Charges: (1) if your Account balance exceeds your applicable credit line at any time during a monthly cycle; or (2) if you make a Purchase or obtain a Cash Advance at a time when your Account balance is over your credit line.

**Administrative Fees**—If you request photocopies of sales slips or duplicate copies of monthly statements, or if you request any special services such as obtaining Cards on an expedited basis, you agree to pay our reasonable charges for such services, as from time to time in effect. The present charges for such services are specified in the Table of Interest Charges. However if you request items such as sales slips or duplicate statements in connection with any disputed billing matter (see "Your Billing Rights"), we will not impose a fee if a billing error is disclosed.

Unless otherwise arranged between us, the annual membership fee and any late, return check, overlimit or administrative fee will be added to your Account and treated as a Purchase.

**Foreign Currency Transactions:** We and MasterCard or Visa (or their affiliates) will convert transactions in foreign currencies into U.S. Dollars. MasterCard or Visa will use their then-current currency conversion procedures. Currently, they use either a wholesale market rate or a government-mandated rate in effect under those procedures and add a conversion charge determined by them. We add an additional two percent to the amount provided to us by MasterCard or Visa. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your Card or Account.

**Liability For Unauthorized Use Of Your Account:** If your Card or Convenience Checks are lost or stolen or if you are afraid someone may use your Account without your permission, you must notify us at once. You may be liable for that unauthorized use of your Account. You will not be liable for unauthorized use that occurs after you notify Cardmember Service, by writing to us at P.O. Box 8651, Wilmington, DE 19899-8651, or verbally by calling us at 1-800-677-7101, of the loss or theft of your Card or Convenience Checks or the possible unauthorized use of your Account. In any case, your maximum liability is $50.00. We may terminate or limit access to your Account if you have notified us or we have determined that your Card or Convenience Checks may have been lost or stolen, or that there may be unauthorized access to your Account.

**Inquiries Or Questions:** You may address any inquiries or questions which you have about your Account to: Cardmember Service, P.O. Box 8651, Wilmington, Delaware 19899-8651, or you may call us at 1-800-677-7101. If you telephone us instead of writing, you may lose certain rights the law gives you to dispute billing errors (see "Your Billing Rights").

R2

[illegible]

INPORTANT ACCOUNT INFORMATION ENCLOSED

**BANK ONE**

[illegible]

# IMPORTANT NOTICE FOR BANK ONE CREDIT CARD CUSTOMERS ABOUT CHANGES TO YOUR BANK ONE CARDMEMBER AGREEMENT— PLEASE READ AND RETAIN FOR YOUR RECORDS

[illegible]

Dear Cardmember:

[illegible]

[illegible]

[illegible]

**SUMMARY OF CHANGES**

[illegible]

**RATE AND FEE CHANGES**

Annual Percentage Rate(s) [illegible]

Cash Advance FINANCE CHARGE

ATM Cash Advance [illegible]

All Other Cash Advances [illegible]

Transaction FINANCE CHARGE [illegible]

Balance Transfer and Convenience Check FINANCE CHARGE [illegible]

Continued on next panel

Continued from previous panel

Late Fees [illegible]

Other Interest Charges

Return Payment Fee [illegible]

Return Convenience Check Fee [illegible]

Overlimit Fee [illegible]

Minimum Monthly Payment [illegible]

Method of computing the balance for purchases [illegible]

Grace Period for repayment of purchase balances [illegible]

Transactions in Foreign Currencies [illegible]

**OTHER CHANGES**

Other sections, including the Arbitration section, also are changing.

**EFFECTIVE DATE AND ACCEPTANCE INSTRUCTIONS FOR THE ABOVE CHANGES:**

[illegible]

**AMENDMENTS TO THE CARDMEMBER AGREEMENT**

[illegible]

1. TABLE OF INTEREST CHARGES FINANCE CHARGES AND FEES

[illegible]

Cash Advance FINANCE CHARGE

ATM Cash Advance [illegible]

All Other Cash Advances [illegible]

Transaction FINANCE CHARGE [illegible]

Balance Transfer and Convenience Check FINANCE CHARGE [illegible]

Late Fees [illegible]

Other Interest Charges

Return Payment Fee [illegible]

Return Convenience Check Fee [illegible]

Overlimit Fee [illegible]

2. DEFAULT RATES [illegible]

[illegible]

3. OBLIGATIONS ON YOUR ACCOUNT [illegible]

[illegible]

4. MINIMUM PAYMENT [illegible]

[illegible]

[illegible]

TRADING FINANCE CHARGE CALCULATIONS [illegible]

[illegible]

ARBITRATION [illegible]

[illegible]

TRANSACTIONS IN FOREIGN CURRENCIES [illegible]

CLOSING YOUR ACCOUNT [illegible]

[illegible]

REFUSAL TO AUTHORIZE TRANSACTIONS/REFUSAL TO PAY CONVENIENCE CHECKS [illegible]

CHANGES TO THIS AGREEMENT [illegible]

INFORMATION SHARING [illegible]

[illegible]

BANK ONE.

Dispute or Legal Department

Chase Manhattan Bank, NA
PO Box 15299
Wilmington, DE 19850-5299

JUL 30 2005

Re: Account 4417124191217329

July 25, 2005

Certified Mail Number: 03041070000173924560

**Dear Chase Manhattan Bank, NA Dispute Department:**

**FIRST NOTICE OF BILLING ERRORS**

Pursuant to 15 U.S.C. 1666, I am writing you at the address on my billing statements to be used for billing inquiries within sixty days of receiving a statement of my account dated July 8, 2005 in connection with extensions of consumer credit: I hereby provide you notice that I believe said statement contains errors in the total amount you allege to be due, and other more specific items, as laid out more completely below. My belief that the statement contains billing errors under 15 U.S.C. 1666(b)(1), (2) and (5) is based upon my belief that you failed to give all the proper disclosures required by law to me prior to opening this account, and additional disclosures since then. Because you failed to provide these disclosures, the account could not legally be opened and I should not be responsible for the payment of interest, fees or other finance charges. While I understand I will likely still be responsible for the repayment of purchases and cash advances, I do not believe I should be responsible for interest, finance charges and other fees. As I have made payments on this account that have been applied to these improper charges the items I claim are billing errors are improperly reflected on the statements in the incorrect amount and/or inaccurate due to a computational or accounting error.

**DISPUTE OF OBLIGATION AND**
**BILLING ERROR PURSUANT TO 15 U.S.C. 1666(b)(1) and (5)**

Because I believe I should not have been charged finance charges or fees for the history of this account, I dispute the accuracy of the following items on my statements which have been calculated based on the inclusion of those charges: the current balance, the amounts and payments due and all finance charges and other fees charged since this account was opened. The exact amount of all such previous finance charges and fees hereby disputed will be determined after you provide the documentary evidence requested below. More specifically, I dispute the accuracy of the following amounts listed on the statement dated July 8, 2005:

1.the alleged current balance of $5,407.82,

2.the alleged finance charges of $57.52, and

3.the minimum payment allegedly due of $108.00.

**BILLING ERROR PURSUANT TO 15 U.S.C. 1666(b)(2)**

Because your claim as to my indebtedness rests on the existence of the alleged account and cardholder agreement, if the account was not able to be opened properly because of your failure to give the disclosures, then the amount of the indebtedness is called into question. Therefore, I request the documentary evidence of indebtedness detailed below. The statement contains billing errors under 15 U.S.C. 1666(b)(2) in that the statements reflect inaccuracies through their individual items, the entire balance due, finance charges and all extensions of consumer credit for which you claim I am indebted to

EXHIBIT B

you, and I request additional clarification regarding all such extensions of consumer credit, including all documentary evidence thereof you possess or are able to obtain, specifically including, but not limited to the following:

1. Copies of all records of my written and signed authorizations for any purchases from all vendors for which an extension of consumer credit is claimed to have been made.

2. For any claimed extension of consumer credit where there is not a written authorization signed by me, a copy of all records of evidence of any other authorization by me, such as use of my PIN, or other identifying information.

3. If you claim any extension of consumer credit where you have no proof of authorization by me, a statement by you of the factual and legal basis of your claim that I am indebted to you for such an extension of consumer credit, or payment to any third party.

4. Copies of documents showing that all disclosures required by law that were given to me prior to opening this account, at any renewing of the account, and otherwise; including documentary evidence that any such disclosure was made to me, by whom, when, how and where.

5. The original cardholder agreement to which you allege I first agreed to, as well as any amendments you allegedly made thereto.

6. An accounting of all interest, fees, or other charges assessed to my account since it was opened.

7. Clarification of the amount(s) that I will need to pay pending the resolution of this billing error dispute and when such amounts will need to be paid.

8. Any other documents you allege, suggest or will rely upon to prove in a court of law or other dispute resolution forum, that I am indebted to you in the amount alleged.

I expect a prompt written response to this billing error dispute and request for documentary evidence made under the FCBA. I wish to make it clear that the forwarding of nothing but copies of previous statements or form letters will not suffice to fulfill this clear request for both specific and general documentation. I sincerely hope that we can come to a quick and mutually beneficial agreement as to how to settle this bona fide dispute. However, should you ignore this matter, I will pursue relief through any and all means legally available to me. Thank you in advance for your anticipated cooperation.

Sincerely,

Mrs. Evelyn L. Hillis

Mrs Evelyn L Hillis

P.S. Feel free to call me at home na if you have any questions on this account.

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 55 148 E 00131 06
Evelyn L. Hillis (Claimant/Hillis)
and
Chase Bank USA, N.A. (Respondent/Chase)

## AWARD OF THE ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Respondent, and the Claimant having failed to appear after due notice by mail in accordance with the Supplementary Procedures for Consumer-Related Disputes, do hereby, AWARD, as follows:

## FINDINGS OF FACT

1. Claimant, Evelyn L. Hillis ("Hillis") opened a credit card account with Respondent, Chase Bank USA, N.A. ("Chase") in August 2003 (the "Account").

2. With the opening of the Account, Chase provided Hillis with a Cardmember Agreement ("CMA") that set forth the terms and conditions of the Account. Among other terms, the CMA discloses the applicable finance charges, the methods used to calculate those charges, the applicable interest rates, and Hillis' payment obligations. The CMA states that use of the Account confirms Hillis' acceptance of the terms and conditions contained in the CMA.

3. Hillis first used the Account in October 2004 when she cashed a convenience check in the amount of $3,000.00. In accordance with the CMA, Chase imposed the applicable finance charges and fees associated with that transaction, as Hillis' November 8, 2004, Account statement reflects.

4. Hillis used the Account only one other time, cashing another convenience check in the amount of $2,850.00. In accordance with the CMA, Chase again imposed the applicable finance charges and fees associated with that transaction. These charges appeared on Hillis' December 8, 2004 statement.

EXHIBIT C

5. In addition to the finance charges that appeared on Hillis' November 8, 2004 and December 8, 2004 statements, finance charges also appeared on each of her monthly statements from January 8, 2005 through June 8, 2005.

6. By letter dated March 29, 2005, Hillis communicated with Chase. In her letter, which Chase received on April 12, 2005, Hillis states that the letter is Chase's "official notice of a billing error dispute." Hillis references the FCBA in the letter, but does not allege any specific violation of that statute. She also does not identify any specific transaction or charge that she disputes.

7. On April 15, 2005, Chase responded to Hillis' March 29 letter, rejected its validity and reminded her of her obligations under the CMA.

8. On June 1, 2005, Chase received another letter from Hillis, identical to that received on April 12, 2005. Chase did not respond to this second letter.

9. On July 25, 2005, Hillis sent Chase a letter entitled "First Notice of Billing Errors." Chase received this letter on July 30, 2005. According to the letter, Hillis was disputing the Account balance reflected on her July 8, 2005 monthly statement. Hillis based her alleged dispute upon her "belief that [Chase] failed to give all the proper disclosures required by law . . . prior to opening [the Account], and additional disclosures since then." The letter further asserted that because Chase "failed to provide these disclosures, the [A]ccount could not legally be opened and I should not be responsible for the payment of interest, fees or other finance charges." The letter did not specify what disclosures have not been made, nor did it specify any transaction that Hillis was disputing.

10. Although Hillis acknowledged in her July 25 letter that she owed the principal amount due on the Account, she also stated that she was "disputing" the "individual items, the entire balance due, finance charges and all extensions of consumer credit for which you claim I am indebted to you." She then requested eight categories of documents, including copies of her signed credit card receipts and lain accounting of all interest, fees, or other finance charges assessed to my account since it was opened."

11. Chase sent a response to Hillis on August 29, 2005, to her July 25, 2005 letter, again reminding her of her obligations pursuant to the CMA and rejecting her claim that she was not responsible for the balance due and owing on the Account.

12. Hillis sent a letter to Chase every month from August 2005 through February 2006. Each of these letters was identical to Hillis' July 25, 2005 letter, containing the same assertions and referring to that month's Account statement as containing unspecified billing errors.

**Conclusions of Law**

1. The Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), governs Hillis' claim. The purpose of TILA is to "assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). Congress delegated to the Federal Reserve Board responsibility for developing regulations for implementing TILA. The Federal Reserve Board regulations are contained in 12 C.F.R., Part 226 (known as "Regulation Z").

2. The procedures for resolving credit billing disputes appear in Part D (Chapter 5) of TILA at 15 U.S.C. §§ 1666-1666j (and the implementing Regulation Z, at 12 C.F.R. § 226.13). This portion of TILA contains the FCBA. The FCBA defines what constitutes a "billing error" at 15 U.S.C. § 1666(b).

3. The FCBA and Regulation Z specify how such proper billing errors must be addressed. First, the creditor must receive written notice of a billing error within 60 days after a consumer has received the first credit card statement reflecting the billing error. Second, the creditor must send the consumer a written acknowledgement of the notice within 30 days. Third, the creditor must — within two complete billing cycles after receipt of the notice (but not later than 90 days) — either (1) make appropriate corrections to the account and send notification of those corrections to the consumer; or (2) send a written explanation or clarification to the consumer after having conducted an investigation, setting forth the reasons why the creditor believes the statement was correct. 15 U.S.C. § 1666(a); 12 C.F.R. § 226.13(b).

4. Regulation Z defines a billing error notice as a written notice from a consumer that:

> (1) Is received by a creditor . . . no later than 60 days after the creditor transmitted the first periodic statement that reflects the alleged billing error;
>
> (2) Enables the creditor to identify the consumer's name and account number; and

　　　　(3) To the extent possible, indicates the consumer's belief and the reasons for the belief that a billing error exists, and the type, date, and amount of the error.

12 C.F.R. § 226.13(b).

5. TILA is a consumer protection statute, but it is not to be used as an "instrument of harassment and oppression of the lending industry." *Greisz v. Household Bank*, 8 F. Supp. 2d 1031, 1036 (N.D. Ill. 1998), *aff'd*, 176 F.3d 1012 (7th Cir. 1999).

6. The creditor's obligations under the FCBA are triggered only if the consumer (1) identifies a billing error as defined by the FCBA; and (2) sends a written notice of that billing error to the creditor within 60 days of the first statement containing the purported error. 12 C.F.R. § 226.13(b)(1); *Dawkins v. Sears Roebuck & Co.*, 109 F.3d 241, 243 (5th Cir. 1997), *also at* 1997 U.S. App. LEXIS 12696, *4; *Pinner v. Schmidt*, 805 F.2d 1258, 1264 (5th Cir. 1986). Here, Hillis did neither.

7. Chase's obligations under the FCBA were never triggered because Hillis failed to identify any billing errors as defined by the FCBA. The letters upon which Hillis bases her claim, and the billing statements to which they relate, are void of any billing errors.

8. There is no legal support for Hillis' claim that a creditor's alleged failure to provide disclosures when an account is opened results in a billing error. Neither TILA, the FCBA nor Regulation Z provides support for a claim that a failure to make required disclosures results in a subsequent billing error as to any or all finance charges or fees.

9. Hillis' assertions in her letters that the Account could not be legally opened due to Chase's purported failure to provide her with pre-lending disclosures and that Chase cannot enforce the parts of the CMA relating to finance charges and other fees, are contrary to established case law. *See Adams v. Trust Co. Bank*, 426 S.E.2d 36, 38 (Ct. App. Ga. 1992) (Violations of the Truth in Lending Act or the Consumer Leasing Act "give rise to the remedies prescribed therein, and do not serve to invalidate the contract or prevent a lender or lessor from enforcing its rights under the contract."); *First Nat'l Bank v. Felt*, 368 N.W.2d 588, 591 (S.D. 1985) ("A failure to comply with [TILA] does not render the underlying obligation unenforceable."); *Wise Furniture v. Dehning*, 343 N.W.2d 26, 30 (Minn. 1984) ("It is important to note though that TILA violation does not affect the validity or enforceability of the

underlying contract."); *Charter Finance Co. v. Henderson*, 326 N.E.2d 372, 329 (Ill. 1975); *Grandway Credit Corp. v. Brown*, 295 So.2d 714, 715 (Fla. App. 1974).

10. To the extent that Hillis' letter may be construed as contending that the finance charge is itself a billing error, she is incorrect. This claim does not fit the three definitions of billing error cited in her letters, or any of the other definitions in Section 1666(b). A finance charge is "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4.

11. Hillis refers to 15 U.S.C. §§ 1666(b)(1), (b)(2) and (b)(5) in her letters, but she fails to satisfy any of those definitions of "billing error." Section 1666(b)(1) defines a billing error as "[a] reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement." Section 1666(b)(2) defines a billing error as "[a] reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof." Both types of billing errors arise out of an underlying "statement of an extension of credit" that the consumer disputes or questions. As set forth above, however, finance charges by definition are not "an extension of credit", but rather are "incident to or a condition of" the extension of credit. *Compare* 15 U.S.C. § 1666(b)(2) *with* 12 C.F.R. § 226.4(a). Section 1666(b)(5) defines a billing error as "[a] computational error or similar error of an accounting nature of the creditor on a statement." Hillis fails to identify any such error in her letters.

12. Hillis' claim also fails because Hillis failed to notify Chase of the purported errors within 60 days from the first time the alleged errors were reflected on her billing statements. Regulation Z provides that the creditor must receive the billing error notice no later than 60 days after the creditor transmitted the first periodic statement that reflects the alleged billing error. 12 C.F.R. § 226.13(b)(1); *Dawkins v. Sears Roebuck & Co.*, 109 F.3d at 243, *also at* 1997 U.S. App. LEXIS 12696 at *4; *Pinner v. Schmidt*, 805 F.2d 1258, 1264 (50 Cir. 1986). If written notice is not received within this sixty day period, the billing error is not timely and the creditor is not required to take any action to respond under the FCBA or Regulation Z. *Dawkins*, 109 F.3d at 243, also at 1997 U.S. App. LEXIS 12696 at *4; *Greisz v. Household Bank*, 8 F. Supp.2d at 1042 (because Greisz did not send a proper written billing error notice

to Household within the requisite amount of time, her FCBA/TILA claim was dismissed on summary judgment), *aff'd*, 176 F.3d 1012, 1015 (7th Cir. 1999) (Plaintiff's FCBA claim and certain other TILA claims "were properly rejected on summary judgment and we have nothing to add to the District Judge's discussion of those claims"). Sending notice within sixty days of subsequent statements that might also reflect the purported billing error does not suffice or trigger any obligations either, because there is no "continuing billing error" concept embodied or permitted under the FCBA and Regulation Z. *Dawkins*, 109 F.3d at 243 n.1, *also at* 1997 U.S. App. LEXIS 12696 at *5 n.1.

13. Hillis was first assessed a finance charge on the Account on her November 8, 2004 statement. According to Hillis' argument that she should not have been charged finance charges due to Chase's supposed failure to make mandatory disclosures when the Account was opened two years earlier, the deadline for providing Chase with a written notice of billing error was 60 days from the date the November 8, 2004 statement was transmitted, because this was the first time finance charges are known to have appeared on the Account. She did not send her first letter until July 25, 2005, which was over six months past the 60-day deadline from the first, November 8, 2004 statement, to contain finance charges.

14. Under 15 U.S.C. § 1640(e), Hillis was required to commence this arbitration within one year of the date of the occurrence of the alleged violation. Under the applicable case law, the one-year statute could have begun at one of two different points in time. Under either, however, the statute of limitations expired before Hillis initiated this arbitration. If Hillis is claiming that she did not receive the required disclosures at the opening of the Account, then the statute of limitations would have begun running at the time she should have received the disclosures, which would have been when the Account was opened. *Goldman v. The First National Bank of Chicago*, 532 F.2d 10, 17 (7th Cir. 1976). If she is claiming that the disclosures were made but were inaccurate or not "proper," the statute would have begun running when the first finance charge was imposed. *Id.* at 21. Hillis' action is barred under either situation. The Account was opened in August 2003 and the first finance charge was assessed on the November 8, 2004 statement. At the latest, Hillis had to bring an action by November 8, 2005. Instead, she initiated this arbitration on March 12, 2006, more than four months after the expiration of the statute of limitations. Her claims are therefore time-barred.

ACCORDINGLY, I award as follows: all claims of Evelyn L. Hillis, Claimant, are denied; the Award is entered in favor of Respondent, Chase Bank U.S.A., N.A.

The administrative fees of the American Arbitration Association totaling $1,250.00 shall be borne as incurred, and the compensation and expenses of the arbitrator totaling $5,990.79 shall be borne as incurred.

This Award is in full settlement of all claims submitted to this Arbitration. All claims, not expressly granted herein, are hereby denied.

2/13/07
Date

David J. Armstrong
David J. Armstrong

I, David J. Armstrong, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

2/13/07
Date

David J. Armstrong
David J. Armstrong